| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY**<br><span style="font-size:small">Caption in Compliance with D.N.J. LBR 9004-2(c)</span><br>**GENOVA BURNS LLC**<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ  07920<br>Phone: (973) 467-2700<br>Fax: (973) 467-8126<br>*Counsel for SITO Mobile Solutions, Inc., SITO Mobile, Ltd., and SITO Mobile R&D IP, LLC.*<br>**DANIEL M. STOLZ**<br>**DONALD W. CLARKE** | |
| In Re:<br><br>**SITO MOBILE SOLUTIONS, INC.[1]**,<br><br>Debtor. | Case No.:  20-21436<br><br>Judge: Honorable Stacey L. Meisel<br><br>Chapter: 11 |
| In Re:<br><br>**SITO MOBILE, LTD.[2]**,<br><br>Debtor. | Case No.:  20-21435<br><br>Judge: Honorable Stacey L. Meisel<br><br>Chapter: 11 |
| In Re:<br><br>**SITO MOBILE R&D IP, LLC[3]**,<br><br>Debtor. | Case No.:  20-21437<br><br>Judge: Honorable Stacey L. Meisel<br><br>Chapter: 11 |

## FIRST AMENDED
## DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF REORGANIZATION

| **IMPORTANT DATES** | |
|---|---|
| Date by which Objections to Confirmation of the Plan Must be Filed and Served: | August 30, 2021 |
| Date by which Ballots Must be Received: | August 30, 2021, 4:00 p.m. ET |
| Hearing on Confirmation of the Plan: | September 14, 2021 at 10:30 a.m. |

---

[1] The last four digits of the Debtors' Federal Tax Identification Numbers are 3380.  The Debtors' corporate headquarters is located at 123 Town Square Place, #419, Jersey City, NJ  07310.
[2] The last four digits of the Debtors' Federal Tax Identification Numbers are 2844.  The Debtors' corporate headquarters is located at 123 Town Square Place, #419, Jersey City, NJ  07310.
[3] The last four digits of the Debtors' Federal Tax Identification Numbers are 3182.  The Debtors' corporate headquarters is located at 123 Town Square Place, #419, Jersey City, NJ  07310.

152654162.1

DocuSign Envelope ID: 50318471-2955-406A-A344-B55464B7DC0E

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.   THE PLAN PROPONENTS BELIEVE THAT THE PROPOSED PLAN PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR AND URGE THAT THE VOTER ACCEPTS THE PLAN.**

## PRELIMINARY STATEMENT

SITO Mobile Solutions, Inc., SITO Mobile, Ltd. and SITO Mobile R&D IP, LLC (collectively "SITO" or "Debtors"), debtor and debtor-in- possession in the captioned Chapter 11 Bankruptcy Case[4] submit this joint disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to accompany their Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated June 9, 2021 (the "Plan"), which has been filed with the Bankruptcy Court.  A copy of the Plan is annexed as **Exhibit "A"** hereto.

The Plan has been negotiated with the Official Committee of Unsecured Creditors (the "Committee") and provides for the payment of all administrative and priority claims, a distribution to unsecured creditors of up to 100% of their allowed claims, the retention of stock by equity holders, a means by which the proceeds of the liquidation of the Debtor's Assets will be distributed under chapter 11 of the Bankruptcy Code, and sets forth the treatment of all Claims against and Equity Interests in the Debtor.  The Plan implements the distribution of the Debtors' Assets to Holders of Allowed Claims against the Debtors' Estates and provides for liquidation of any remaining Assets.

## PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.  Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that: (i) summarizes the Plan and alternatives to the Plan, (ii) advises Holders of Claims and Equity Interests of their rights under the Plan, (iii) assists Creditors that are entitled to vote to make informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of these Bankruptcy Cases.  Please note, however, that this Disclosure Statement cannot tell you everything about your rights.  For instance, this Disclosure Statement cannot and does not provide a complete description of all of the applicable provisions of the Bankruptcy Code or of other matters that may be deemed significant by creditors and other parties

---

[4] All capitalized terms not otherwise defined herein shall have the meanings ascribed in the Plan, which is attached as **Exhibit A**.

DocuSign Envelope ID: 59318471-2955-4A6A-A344-B55464B7DC0E

in interest.  You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Plan provides a means by which the proceeds of the liquidation of the Debtor's Assets will be distributed under chapter 11 of the Bankruptcy Code, and sets forth the treatment of all Claims against and Equity Interests in the Debtor.  The Plan implements the distribution of the Debtor's Assets to Holders of Allowed Claims against each Debtors' Estates and provides for liquidation of any remaining Assets.

**B.**  **Definitions and Exhibits**

**1.**  **Definitions.**  Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will have the meanings ascribed to such terms in the Plan.

**2.**  **Exhibits.**  The following exhibits are annexed hereto and expressly incorporated herein:

Exhibit A:    A copy of the Plan.
Exhibit B:    A copy of the Plan Administrator Agreement
Exhibit C:    Plan Funding Agreement
Exhibit D:    Listing of Creditors who are potential Defendants in IP Litigation
Exhibit E:    List of Class 2 Noteholders

**C.**  **Enclosures**

The following materials are included with this Disclosure Statement:

**1.**    A copy of the Plan.

**2.**    A copy of an Order approving the Disclosure Statement (the "Disclosure Statement Order"), which states: (a) the date by which objections to confirmation of the Plan must be served and filed, (b) the date by which all votes with respect to the Plan must be cast, (c) the date of the hearing in the Bankruptcy Court to consider confirmation of the Plan, and (d) other relevant information.

**3.**    A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice").

**4.**    A ballot (and return envelope) for voting to accept or reject the Plan, unless you are not entitled to vote because you are not Impaired under the Plan and are conclusively presumed to accept the Plan.

DocuSign Envelope ID: 5D318471-2955-40BA-A244-B55464B7DC9E

D.  **Representations and Limitations**

NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR OR THE COMMITTEE.

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN.  ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.

THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTORS IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO THE DEBTORS AS OF THE DATE HEREOF.  ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED.   THE DEBTORS BELIEVE THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, FINANCIAL INFORMATION AND DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE

DocuSign Envelope ID: 59318471-2955-4D9A-A244-B55464B7DC9F

THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. STATEMENTS CONCERNING SUCH ANTICIPATED OR FUTURE MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR AND EQUITY INTEREST HOLDER IS ENCOURAGED TO READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

UPON CONSUMMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE. TO THE EXTENT THAT SECTION 1145 IS EITHER NOT PERMITTED OR NOT APPLICABLE, SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, THE DEBTORS AND ANY OF THEIR RESPECTIVE AFFILIATES, AGENTS,

DocuSign Envelope ID: 50318471-2955-4A6A-A344-B55464B7DC0F

**REPRESENTATIVES, MEMBERS, SHAREHOLDERS, OFFICERS, DIRECTORS, EMPLOYEES, PRINCIPALS, ADVISORS AND ATTORNEYS SHALL BE DEEMED TO HAVE PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTORS, OF AN AFFILIATE PARTICIPATING IN THE PLAN WITH THE DEBTORS, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTORS UNDER THE PLAN, AND THEREFORE SUCH PARTIES WILL NOT BE LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE OR PURCHASE OF SECURITIES.**

### E. Important Dates

The Bankruptcy Court approved this Disclosure Statement by and through the Disclosure Statement Order entered on     July 20, 2021          , after notice and hearing and in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Court found that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan.  **HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

As stated in the Disclosure Statement Order, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for August 18, 2021 at 10:30 a.m./p.m. in Courtroom 3A, 50 Walnut Street, 3rd Floor, Newark, New Jersey 07102.  Holders of Claims and Equity Interests and other parties in interest may attend this hearing.

Objections to confirmation of the Plan must be filed on or before August 9, 2021 at 4:00 a.m./p.m., as set forth in the Disclosure Statement Order, and must be filed with the Court and served upon the following parties by no later than August 9, 2021 at 4:00 p.m. (the "Objection Deadline"):

- Counsel to the Debtor, Genova Burns LLC, Attention:  Daniel M. Stolz, Esq. and Donald W. Clarke, Esq., 110 Allen Road, Suite 304, Basking Ridge, New Jersey 07920, (dstolz@genovaburns.com and dclarke@genovaburns.com); and

- Counsel to the Committee, Perkins Coie LLP, Attn: Gary F. Eisenberg, Esq., 1155 Avenue of the Americas 22nd Fl., New York, NY 10036-2711, GEisenberg@perkinscoie.com; Perkins Coie LLP, Attn: Amir Gamliel, Esq., 1888 Century Park East, Suite 1700, Los Angeles, CA 90067-1721, AGamliel@perkinscoie.com, Perkins Coie LLP, Attn: Kathleen Allare, Esq., 131 S. Dearborn Street, Suite 1700, Chicago, IL 60603-5559, KAllare@perkinscoie.com.

DocuSign Envelope ID: 59318471-2955-4A6A-A344-B55464B7DC0F

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by the Debtor by no later than August 9, 2021 at 4:00 p.m. Completed and signed Ballots should be returned to the Debtor by: (i) mail, in the return envelope provided with each, (ii) overnight courier or (iii) personal delivery.

### F.  **Identity of Persons to Contact for More Information Regarding the Plan**

Any interested party desiring further information about the Plan should contact: (i) Counsel for the Debtor, Genova Burns, LLC, Attention: Daniel M. Stolz, Esq. or Donald W. Clarke, Esq., 110 Allen Road, Suite 304, Basking Ridge, New Jersey 07920, (973) 467-2700, dstolz@genovaburns.com or dclarke@genovaburns.com or (ii) Counsel to the Committee, Perkins Coie LLP, Attn: Gary F. Eisenberg, Esq., 1155 Avenue of the Americas 22nd Fl., New York, NY 10036-2711,  GEisenberg@perkinscoie.com; Perkins Coie LLP, Attn: Amir Gamliel, Esq., 1888 Century Park East, Suite 1700, Los Angeles, CA 90067-1721, AGamliel@perkinscoie.com, Perkins Coie LLP, Attn: Kathleen Allare, Esq., 131 S. Dearborn Street, Suite 1700, Chicago, IL 60603-5559, KAllare@perkinscoie.com.

### G.  **Solicitation Procedures**

As is further set forth herein, Creditors holding Claims that are Impaired have the right to vote to accept or reject the Plan.  Generally, a claim or equity interest is impaired if a plan alters the legal, contractual or equitable rights of the holder of the claim or equity interest.  A class of creditors accepts a plan when creditors holding two-thirds (2/3) in amount of such class and more than one-half (1/2) in number of the claims in such class who actually cast their ballots vote to accept the plan.

The Plan in this Bankruptcy Case classifies the Holders of Claims and Equity Interests against the Debtor into four (4) Classes.  The classification of Claims and Interests against the Debtor pursuant to the Plan, is as follows:

| Summary of Classification and Treatment of Classified Claims and Equity Interests | | | |
|---|---|---|---|
| Class | Claim | Status | Voting Rights |
| 1 | Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Noteholder Loans | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Equity Interests | Unimpaired | Deemed to Accept |

**Votes on the Plan will be solicited from Class 2 and Class 3 only and Holders of Claims in Class 2 and Class 3 are the only parties that are entitled to submit Ballots voting on the Plan.**

### H.  **Recommendation**

It is the Debtors' opinion, as well as that of the Committee, that the treatment of creditors and equity interest holders under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the reorganization or liquidation of the Debtors.  In addition, any alternatives, other than confirmation of the Plan, could result in delays and increased administrative expenses, thereby likely resulting in smaller distributions to holders of Allowed

DocuSign Envelope ID: 50318471-2955-406A-A344-B55464B7DC0F

Claims.  The Debtors, supported by the Committee, submit that confirmation of the within Plan is in the best interest of the Debtors' creditors and Equity Interest Holders and recommend that all holders entitled to vote on the Plan accept to vote to accept the Plan.

## I.    Background

On October 8, 2020, the Debtors filed three separate Voluntary Chapter 11 Petitions under the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey.  On November 13, 202, the Bankruptcy Court ordered Joint Administration of the bankruptcy cases.  Since the Petition Date, the Debtors have remained in possession of their assets and affairs as debtors-in-possession.  No trustee has been appointed for the Debtors.  An Official Committee of Unsecured Creditors (the "Committee") has been formed, consisting of three members and the Committee has retained the firm of Perkins Coie LLP as its counsel.

## J.    Description and History of the Debtor's Business

SITO Limited was originally incorporated in 2001 under the name Single Touch Interactive, Inc.

Single Touch Interactive's initial business operations comprised a number of software applications directed at the emerging mobile phone market including an Abbreviated Dial Code (ADC) offering, a platform for downloading content (images, ringtones, games) to a mobile phone, and mobile couponing.

Late in 2007, Single Touch Interactive, Inc. signed a Master Services Agreement with AT&T Services, Inc. involving the delivery of a free-to-end-user (FTEU) text reminder system/customer interaction program for Wal-Mart.  By 2009, this text (Short Message Service - SMS) reminder program at Wal-Mart had become material to the company's ongoing revenue generation.  Through integration with the client's customer relationship management (CRM) database, the SMS service created a platform for building customer loyalty and increased sales via highly tailored programs, including messaging, customer incentive programs, and couponing (e.g. Walmart used FTEU for its pharmacy operations for both prescription refill reminders and pick-up notifications).

On May 21, 2008, Single Touch Interactive completed a reverse merger with Hosting Sites Network, Inc. (HSN), a Delaware corporation listed on the OTC Bulletin Board. HSN changes its name to Single Touch Systems, Inc.

Throughout 2009 to 2013, management focused the company on growing the SMS product offering, whereby the relationship with AT&T and WalMart represented nearly all reported revenue during that time.

DocuSign Envelope ID: 50318471-2955-4A6A-A344-B55464B7DC0F

With the explosive popularity of mobile phones on the rise, in 2014 the Single Touch companies pivoted and started to rebrand as a mobile ad tech platform offering targeted mobile location-based advertising and mobile messaging.

In May 2009 Single Touch Systems acquired streaming patents from Streamworks Technologies, Inc. a Delaware corporation, in a stock purchase agreement.

Starting in 2010, Single Touch Systems, Inc., started expanding its IP patent portfolio, which was comprised of internal R&D as well as technology purchased from other entities. The portfolio covers the operations of dynamic advertising insertion into digital audio and video streams, certain methods of sending information to and between mobile devices, and methods surrounding the access of information on a mobile device.

On October 12, 2012, Single Touch Systems, Inc. and subsidiary Single Touch Interactive, Inc. created a new wholly owned subsidiary, Single Touch Interactive R&D IP, Inc. to consolidate its intellectual property (IP) assets.

In July 2014, Single Touch Systems, Inc. acquired DoubleVision Networks, a privately held mobile audience buying and targeting platform that purchases advertising inventory for targeted mobile devices.

On September 26, 2014, Single Touch Systems, Inc. was rebranded with the new name of SITO Mobile, Ltd., and associated subsidiaries of SITO Mobile Solutions, Inc. (previously Single Touch Interactive, Inc.), and SITO Mobile R&D IP, LLC (previously Single Touch Interactive R&D IP, Inc.,) the holder of all intellectual property of the parent SITO Mobile, Ltd.

### *Prepetition Indebtedness*

In October 2014, SITO Limited secured $10mm in senior secured notes from Fortress Credit Co. in exchange for granting a security interest in all assets, including the portfolio of patents, as well as an intellectual property revenue sharing agreement that provided for proceeds from the sale or licensing of patents to be used to reduce the outstanding borrowings from Fortress. With the proceeds from this financing, the SITO Limited repaid all outstanding convertible notes in the aggregate principal amount of $3,708,000 and accrued interest, which eliminated the potential issuance of approximately 7.7 million shares of the SITO Limited's common stock upon the conversion of the convertible notes.

In July 2015, SITO Limited acquired Hipcricket for stock and cash for an aggregate price of $3.7 million. The purchase enabled SITO Limited to tap new revenue streams for its mobile advertising business through Hipcricket's existing customer relationships with both advertisers and brands.

In August of 2015 SITO Limited obtains an uplisting to the Nasdaq National Market stock exchange.

In February of 2017 SITO Limited sells its SMS Messaging Portfolio to 3Cinteractive, effectively exiting from its legacy non-core SMS business to focus on its digital ad-media technology and IP portfolio.

Between 2014 and 2017, SITO Limited expanded its yearly top line revenue from $3.5 million to $29 million. However, SITO Limited's operations were consistently short on cash-flow resulting in cumulative losses in operations.

### *Change in Operations*

After the acquisitions of DoubleVision and Hipcricket, SITO Limited began investing in the development of its mobile advertising product platform (the "Tech Stack" or "Platform"), which was a combination of programming languages and code, libraries, servers, software, tools and people (both in the United States and offshore).  In order to activate the Platform, large amounts of data from numerous providers was purchased and stored in a SITO-owned data cloud storage.

The Tech Stack and data allowed brands, agencies and retailers the ability to deliver targeted ad campaigns (e.g. ads, coupons, promotions) to mobile phones based on geo-location, in-store traffic and customer response, allowing marketers to target audiences in real time based not only on location, but on interests, behaviors and brand loyalties and offer the opportunity to deliver a coupon or special offer to a consumer right when he or she is in the vicinity of the vendor. Offerings include: Geo-fencing – targeting customers within a certain radius of a location; Verified Walk-in – tracking foot-traffic to locations and seeing which ads drove action into the store; and Behavioral Targeting – tracking past behaviors over 30-90 day increments allowing for real-time campaign management.

### *Executive Turnover / Shareholder Challenges*

In early 2017, the Board accepted the resignations of both the CEO Gerald Hug and CFO Kurt Streams for alleged financial misconduct.

A class action lawsuit was filed on February 17, 2017 accusing Hug and Streams for misconduct with Violation of the Federal Securities Law. [5]

On August 29, 2019, the SEC sued ex CEO Hug and ex CFO Streams, for fraud relating to expense report charges.[6]

In February of 2017, Rory O'Connell was appointed as interim CEO.

---

[5]Roper vs SITO MOBILE LTD., JERRY HUG, and KURT STREAMS http://securities.stanford.edu/filings-documents/1060/SML00_01/2017217_f01c_17CV01106.pdf

[6]SEC against GERARD F. HUG and KURT W. STREAMS, Case 1:19-cv-16290 https://www.sec.gov/litigation/HugStreams

DocuSign Envelope ID: 50318471-2955-4D6A-A344-B55464B7DC0F

Starting in February of 2017, the company received a 13-D filing on behalf of Stephen Baksa and Thomas Candelaria.  A shareholder proxy ensued to remove five of the six existing Board Members along with the appointments of a permanent CEO, COO, CFO management team.

The 13-D proxy successfully passed a shareholder vote, and the changes were announced on June 5, 2017.

In the 4th quarter of 2017, Tar Holdings, Inc., a former shareholder, acquires senior secured notes from Fortress Credit Corp.

### *Further Operational Changes*

In the second quarter of 2018, the SITO Limited successfully sold 2.6 million shares at $5.00 per share through a secondary stock offering led by Oppenheimer and Lakestreet Capital.

A portion of the proceeds was used to repurchase the senior secured notes from Tar Holdings, restoring the intellectual property to SITO Mobile R&D.

Throughout 2018, the rapid growth in large customer national enterprise opportunities revealed the inadequacy of the technology platform and its inability to deliver a consistent performing data product.  SITO Limited's technology started to show signs of code and data-related problems, as well as becoming increasingly costly to revise existing source code and develop necessary future enhancements.  Software development teams in the U.S. and offshore worked around the clock to manage these issues and fix recurring bugs, which prevented successful sales to customers from being delivered.

As a result of the continued inefficiencies in the Platform, the company suffers an exodus of senior level employees resulting in approximately $1 million in severance obligations.

In addition, the Company's senior sales staff is recruited in mass by Ed Silhan, ex Sales Manager, who opens an office for a direct competitor across the street from SITO Limited's headquarters.

During mid-2018, SITO Limited's management recognized an industry trend in the ad media placement business which had become flooded with competition thus reducing margins on ad media placements dramatically.  Management pivoted away from focusing on ad media and decided to focus revenue direction towards delivering data intelligence.  SITO Limited's data stored in the cloud was not in a form readily available to deliver data insights without major enhancements that could take 6 to 9 months to complete. Sales revenue was impacted because of this delay in delivering an enhanced data insights product, resulting in delayed or cancelled revenue.  SITO Limited hired several outside contractors to effect the changes needed to enhance the data, adding direct costs to the bottom line.

By the end 2018, continued operational loss from the ad media to the data insights pivot, in addition to the legacy ad media operational expenses, led to the accumulation of unpaid balances with past vendors.

Realizing that the continued high cost of investing in building and delivering a product in-house was no longer a viable option, SITO Limited elected in the beginning of 2019 to outsource and partner its technology development around existing customer needs. This move allowed SITO Limited to reduce its overhead significantly by cutting costs associated with maintaining and developing its technology platform, including labor, licensing, and data vendor expenses by 70%.

### *Aviron Ponzi Fraud*

By the end of the first quarter of 2019, the salesforce utilized SITO Limited's new outsourced technology partners and put together a $10 million-dollar digital media marketing contract for Aviron Entertainment ("Aviron"). Aviron contracted to have SITO Solutions develop and execute a targeted social media, data insights and ad media placement campaign (the "Aviron Contract") for a worldwide release of the movie *After*.

SITO Solutions incurred $8,674,234.39 in unsecured vendor debt, inclusive of $3.5 million dollars SITO Solutions spent out of pocket to perform under the Aviron Contract.

The Aviron Contract work continued through the end of May 2019. SITO Solutions then sought collections from Aviron under its invoices submitted from March, April and May. After numerous discussions with Aviron's CEO, William Sadleir, it became apparent that Aviron was refusing to remit payment according to the terms of the contract.

On October 7, 2019, SITO Solutions filed suit against Aviron for $12.42 million, in Los Angeles County Superior Courts, for breach of contract. Subsequently, BlackRock Multi-Sector Income Trust (lending/investor) and After Productions (production company) each filed separate lawsuits against both Aviron Entertainment and CEO William Sadleir.[7]

Due to Aviron indicating that it may seek filing Chapter 7 liquidation to remedy any claims, SITO Solutions was granted a Writ of Attachment hearing scheduled for September 29, 2020. Ultimately, before the Court could grant the Writ of Attachment, Aviron filed its Chapter 11 Petition in the Bankruptcy Court in California.

### *Securities and Exchange Commission Litigation*

On May 22, 2020, the Securities and Exchange Commission charged William Sadleir with defrauding a publicly traded fund of at least $13.8 million.[8]

After being investigated by the FBI, the US Attorney's Office arrested Mr. Sadleir on charges related to the improper use of $1.7 million dollars in Paycheck Protection Program funds.[9]

---

[7] https://unicourt.com/case/ca-la23-sito-mobile-solutions-inc-a-corporation-vs-aviron-pictures-llc-450225

[8] https://www.sec.gov/litigation/litreleases/2020/lr24824.htm

[9] https://deadline.com/2020/05/coronavirus-crime-aviron-pictures-william-sadleir-arrested-1202941935/

DocuSign Envelope ID: 59318471-2955-4B6A-A344-B55464B7D69F

Aviron's willful failure to pay SITO Solutions caused a significant hardship to the company, basically depriving it of any cash necessary to pay vendor debts, maintain its operation expenses and continue servicing customers.

While SITO Solutions is conducting its separate Aviron campaign on the new outsourced platform, SITO Solutions' non-Aviron business went dark due to its legacy platform provider, Clearcode, shutting down service due to late payment of past invoices.

SITO Solutions had over 300 customers running on the platform and had to quickly find an outside, third-party technology partner to manage to assist in running the campaigns, which it finds and transitions its campaigns. During this time, campaigns could not run for approximately three weeks, resulting in the loss of several large key customers, in addition to numerous others due to lack of functionality and technical performance needed to support key customer requirements.

### *Failed MediaJel Merger and Media Capital Stock Sale*

In the beginning of the 3rd quarter of 2019, SITO Solutions entered into a Commercial Agreement with MediaJel, Inc. to transition all remaining customer ad media campaigns from the interim platform to the MediaJel platform.

In order to maintain the sales pivot strategy, on September 16, 2019, SITO Solutions announced a merger with MediaJel Inc. of Walnut Creek, CA. MediaJel was in the same business as SITO Solutions of delivering targeted ad media campaigns, but it had its own proprietary in-house technology platform to run the campaigns. They were not considered a direct competitor, as their core media business was primarily focused on the cannabis industry. The companies and their investment bankers agreed that this was a good synergistic fit.

Over the fourth quarter, significant time and money was put into the due diligence and shareholder proxy for the SITO Limited / MediaJel merger. The Agreement called for, among other things, a current audited financial report of MediaJel as a condition to close the deal. SITO Solutions committed legal and proxy costs to fulfill its obligations to the Agreement and incurred additional unsecured debt as the transaction failed to close in the time specified.

Concurrent with the MediaJel transaction, SITO Limited also sought capital from investment firms for a cash infusion. SITO Limited entered into a signed agreement with a private equity firm, Merida Capital, who committed to invest $1million pursuant to a stock purchase agreement. Merida Capital failed to remit payment to SITO Limited.

By the end of 2019, MediaJel failed to deliver a current audited financial statement and the merger initiative was allowed to terminate in January of 2020. SITO Limited had incurred significant additional unsecured debt as a result of the attempted merger.

DocuSign Envelope ID: 50318471-2955-486A-A344-B55464B7D60F

### *Patent Litigation*

At the beginning of 2020, SITO Limited adopted the strategy of monetizing its large patent portfolio through the wholly owned subsidiary, SITO R&D.  The portfolio is comprised of 40+ patents encompassing 3 broad categories:

- Digital Video and Audio Streaming and Advertising
- Sending Information to and between Mobile Devices
- Accessing Information on a Mobile Device

Since 2012, SITO Limited pursued legal opinions in an attempt to document its intellectual property value. For many years, SITO Limited believes several internet streaming media providers (for example, Hulu and FloSports) have been using technology patented by SITO R&D without permission.

Beginning in the second quarter of 2019, SITO R&D consulted with several prominent patent law firms to begin the strategy of monetizing the its patent rights.

On May 4, 2020, SITO R&D engaged the law firm of Goldberg Segalla, a heavily experienced firm specializing in patent monetization, on a contingency basis to successfully assert the SITO R&D's patent rights.

On June 2, 2020, SITO R&D filed the first of patent infringement lawsuits against Hulu and FloSports (case numbers 6:20-cv-00472 and 6:20-cv-00471, respectively) in the Western District of Texas Court, Waco Division.

On October 1, 2020, SITO R&D filed its third patent lawsuit against Blue Scout Media (case number 6:20-cv-00910) in the Western District of Texas Court, Waco Division.

During the course of this Chapter 11 proceeding, four additional lawsuits have been filed by the Debtors.

### *COVID-19 Pandemic Effect on Operations*

In March 2020, COVID-19 emerged and brought SITO Solutions' operations to a halt. SITO Solutions' core business of delivering ads and data insights to mobile phones and drawing foot traffic into theaters and brick and mortar business was no longer effective because people were not going out of their homes due to COVID-19 instructions to stay indoors. SITO Solutions could not measure the foot traffic its campaigns required, and customers needed. Digital mobile ad business nationally became impacted, and ultimately worldwide by the COVID-19 pandemic.

### K.  Significant Events During the Bankruptcy Case

On October 8, 2020, SITO Mobile Solutions, Inc., SITO Mobile, Ltd. and SITO Mobile R&D IP, LLC filed separate Chapter 11 Petitions.  SITO Mobile, Ltd. is the parent of SITO Mobile

Solutions, Inc. and SITO Mobile R&D IP, LLC. SITO Mobile Solutions, Inc. is the operating company and SITO Mobile R&D IP, LLC owns all of the intellectual property.

Pursuant to Order dated November 13, 2020, the three Debtor Chapter 11 cases were directed to be jointly administered, with SITO Mobile Solutions, Inc. being the "lead case". Also by Order dated November 13, 2020, the Court authorized the Debtors to maintain existing bank accounts and cash management systems.

By Orders dated November 16, 2020 the Court authorized the Debtors to make certain critical payments to vendors and authorized the Debtors to obtain post-petition financing, on an interim basis, to fund ongoing post-petition operations.

On November 3, 2020, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") consisting of the following members: Adobe, Inc., SEM Internet, and Luis Serra. The Committee voted to retain the firm of Perkins Coie, LLP as its counsel. On December 1, 2020, the Court granted the application to retain Perkins Coie, LLP as counsel to the Committee.

On December 23, 2020, the Debtors filed a second application for authority to obtain post-petition financing to continue to fund operations. By Order dated December 30, 2020, the Court granted the Debtors authority to secure the second tranche of post-petition financing, on an interim basis.

On December 24, 2020, the Debtors applied for the retention of Bruce G. Bernstein PLLC and Goldberg Segalla LLP as special counsel to prosecute certain intellectual property litigation on the Debtors' behalf. By Order dated February 9, 2021, the Bernstein retention was approved by the Court. Prior to the entry of the Order retaining Goldberg Segalla as special counsel, the Debtors were advised that the attorneys handling the IP litigation were leaving Goldberg Segalla to form their own firm. Therefore, the application to retain Goldberg Segalla was withdrawn. By Order dated March 23, 2021, the Debtors were authorized to employ Daignault Iyer as special counsel, to prosecute the IP litigation. Messrs. Daignault and Iyer were the attorneys responsible for the IP litigation at Goldberg Segalla. The retention of both Daignault Iyer and Mr. Bernstein is solely on a contingency fee basis.

On March 29, 2021, the Debtors moved before the Court for authority to settle pending litigation against FloSports, Inc. and to enter into a Patent License Agreement with FloSports. Pursuant to Order dated April 21, 2021, the Debtors were authorized to enter into a settlement with FloSports and to enter into a Patent License Agreement with FloSports. The FloSports settlement has been consummated. An issue remains with regard to the amount of expense reimbursement to Goldberg Segalla and Daignault Iyer with regard to the FloSports settlement proceeds. The retention of Daignault Iyer is solely on a contingency fee basis. Mr. Bernstein is entitled to receive a monthly fee of $10,000.00, plus a contingency fee.

As the within Plan involves a public company, the Debtors have moved for the retention of Hiller PC as special counsel to handle SEC matters.

DocuSign Envelope ID: 50318471-2955-406A-A344-B55464B7DC0F

During the course of the within Chapter 11 cases, the Debtors have applied for and been granted extensions of the Debtors' exclusive periods to file and seek confirmation of a Plan of Reorganization. The within Plan and Disclosure Statement have been filed within such exclusivity period.

## L. <u>Bar Date</u>

Upon the Debtors' filing of their bankruptcy Petitions and Schedules, notice was sent to all Creditors, providing them with the opportunity to file a Proof of Claim on or before the Bar Date, which was April 6, 2021. A substantive review of Claims of Creditors has not yet been conducted in the Bankruptcy Case. The Plan provides for a Claims Objection Bar Date that coincides with  the Effective Date of the Plan.

### 1. <u>Substantive Consolidation</u>

As set forth previously in this Disclosure Statement, pursuant to Order of the Bankruptcy Court, the three Chapter 11 cases have been ordered jointly administered. The joint administration is merely an administrative and procedural vehicle to eliminate the need to file pleadings in each of the three cases. The Bankruptcy Courts have embraced and authorized the substantive consolidation of multiple pending bankruptcy cases, where appropriate. The effect of substantive consolidation is that, for bankruptcy purposes and bankruptcy purposes only, the assets and liabilities of multiple debtors are consolidated, so that the assets and liabilities of the multiple debtors are pooled and treated as if there was one single debtor. For the reasons set forth below, the Debtors believed that substantive consolidation of the assets and liabilities of SITO Mobile Solutions, Inc., SITO Mobile, Ltd. and SITO Mobile R&D IP, LLC is appropriate in these Cases.

As set forth in the pre-bankruptcy history set forth heretofore, the Debtors have always operated as a unified entity. All financial statements and filings have been performed on a consolidated basis. Parties dealing with each of the entities have believed that they were dealing with one consolidated entity, whose assets were available to be used by the consolidated entity.

In light of the historical factors set forth herein, the Debtors believe that it would be inequitable for creditors to treat any of the three Debtors as isolated entities for purposes of the within Plan of Reorganization. The Committee concurs in the Debtors' position in this regard. In reviewing the claims registers for each of the three Debtor Cases, it appears that creditors have also asserted claims as if the Debtors were one entity.

Based upon the foregoing, in connection with confirmation of the Debtors' Plan of Reorganization, the Debtors will seek the entry of an Order substantively consolidating the three Debtor Estates.

DocuSign Envelope ID: 5031847A-2955-48GA-A344-B55464B7DC0F

### 2. **Unsecured Claims**

Because the Debtors believed that most, if not all creditors dealt with the three Debtor entities as a unified company, the Debtors utilized the same listing of creditors for each three cases. The Schedules of Liabilities filed by the Debtors showed a total unsecured claims in the amount of $19,412,256.37. Some of the scheduled creditors have filed proofs of claim, others have not. To the extent that a claim is listed in the Debtors' schedules as not disputed, contingent or unliquidated, a creditor need not file a proof of claim.

While the Debtors have not completely reviewed the claims filed, it is the Debtors' belief that Class 3 Unsecured Creditor Claims will total between $14 million and $15 million.

The foregoing total of anticipated unsecured claims does not include the claims of Noteholders, who are separately classified as Class 2 Creditors. The total amount due to Noteholders, with interest through the Petition Date is $4,955,651.00.

### 3. **Executory Contracts and Unexpired Leases**

As of the Petition Date, the Debtors were parties to only a small number of executory contracts and unexpired leases. An executory contract is a contract where post-petition performance is required both by the Debtors and the other party to the contract. To the extent that the Debtors wish to assume and remain obligated under an executory contract, the Debtors will bring a motion before the Bankruptcy Court seeking approval of such assumption. To the extent an executory contract or unexpired lease is not specifically assumed, by separate motion, the executory contract or unexpired lease will be deemed rejected on the Effective Date of the Plan.

### 4. **Preference and Other Avoidance Actions**

Chapter 5 of the Bankruptcy Code permits a debtor in possession or trustee to seek recovery of certain pre-petition or post-petition transfers by the Debtors. Creditors who received payment within 90 days of the Petition Date, out of the ordinary course of business, may be sued to seek recovery of said payments. The Debtors or trustee may also seek recovery of pre-petition transfers where less than reasonably equivalent value was received in exchange for such transfers. In conjunction with preparing the Debtors' schedules and statements, the Debtors performed an initial analysis of potential preference or other avoidance actions that may belong to the Debtors' estates. Certain additional Avoidance Actions have been identified postpetition. The following is a list of retained Avoidance Actions: all Claims and Causes of Action against: (a) MediaJel, Inc., (b) Spectrum/Blue Vine; , (c) Vaco Bridgewater, LLC, (d) Pepper Hamilton LLP, (e) Smaato, Inc., (f) The Rubicon Project, Inc., (g) Reset Digital Media, (h) Mark Del'Priore, and (i) Google Cloud Storage. .

The Plan Administrator expressly reserves all rights to commence appropriate actions in his discretion pursuant to Chapter 5 of the Bankruptcy Code.

5. **The Plan**

Chapter 11 is the chapter of the Bankruptcy Code primarily used by businesses who are seeking reorganization, rather than liquidation. Under the within Plan, the Debtors seek to reorganize and emerge from Chapter 11.

The commencement of a chapter 11 case creates an estate that is comprised of all legal and equitable interests of the debtor as of the Petition Date. Formulation of a chapter 11 plan is the primary purpose of a chapter 11 case. A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and shareholders with respect to their claims and equity interests in the debtor.

In general, confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any person acquiring property under the plan, and any creditor or interest holder of a debtor, whether or not they vote to accept the plan. As is more fully described herein, the plan (i) divides Claims and equity interest into categories or "Classes", (ii) sets forth the treatment afforded to each Class, and (iii) provides the means by which the proceeds to be paid to creditors will be distributed. A Claim can be Impaired if the Plan alters the legal, equitable or contractual rights to which the Holder of the Claim is otherwise entitled. If the Plan is confirmed, each creditor's recovery is limited to the amount provided in the Plan. Only creditors in Classes that are Impaired may vote on whether to accept or reject the Plan, and only Creditors of Allowed Claims may vote. A Class that is not Impaired can conclusively conclude to accept the Plan. In addition, administrative expense claims (including Professional Fee Claims), Priority Tax Claims and U.S. Trustee Fees are not classified and are treated in the manner set forth in the Plan and summarized below. Under the within Plan, there will be distribution to Classes of Creditors subsequent to the Effective Date of the Plan. Such distributions will be made by the Plan Administrator appointed under the Plan. That Plan Administrator will also collect proceeds from litigation recoveries and distribute those proceeds in accordance with the terms and the provisions of the Plan. The Plan designates 3 Classes of Claims and 1 Class of Equity Interests. These Classes and Plan treatments consider the different nature and priority under the Bankruptcy Code of the various Claims and Interests, as follows:

a. **Unclassified Claims**

i. *Administrative Expense Claims*

Subject to the Administrative Expense Claims Bar Date and other provisions herein, unless the Holder of an Allowed Administrative Expense Claim agrees to different or less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than of a Professional Fee Claim), will receive in full and final satisfaction of its Administrative Expense Claim, Cash equal to the amount of such Allowed Administrative Expense Claim upon the later of (i) the Effective Date or (ii) thirty (30) days after the date on which such Allowed Administrative Expense Claim becomes an Allowed Claim. Allowed Administrative Expense Claims shall be paid first, from the Administrative Reserve.

### ii.    Professional Fee Claims

Unless such Holder agrees to a different and less favorable treatment of such Claim, each Holder of an Allowed Professional Fee Claim shall receive in full and final satisfaction of its Professional Fee Claim, Cash equal to the amount of such Allowed Professional Fee Claim on, or as soon as reasonably practicable after, the first Business Day following the date upon which such Claim becomes Allowed by a Final Order of the Bankruptcy Court.

The fees and expenses of professionals retained by the Plan Administrator on and after the Effective Date, shall be paid by the Plan Administrator within thirty (30) days of receipt or presentment of invoice(s), or on such other terms as the Plan Administrator and the applicable professional may agree to, without the need for further Bankruptcy Court approval. The Plan Administrator shall be compensated at a rate of $650.00 per hour, as set forth in the Plan Administrator Agreement, which is attached hereto as **Exhibit "B".**

### iii.    U.S. Trustee Fees

All U.S. Trustee Fees shall be paid by the Effective Date. Thereafter, the Plan Administrator shall pay all U.S. Trustee Fees in accordance with the terms of the Plan until such time as the Bankruptcy Court enters a final decree closing the Chapter 11 Cases or the Bankruptcy Case is dismissed or converted.

## b.    Classified Claims

### i.    Class 1 - Priority Claims

_Classification_: Class 1 consists of certain pre-petition wage Claims against the Debtor. Pursuant to the applicable provisions of the Bankruptcy Code, wage claims must be for services rendered within six months of the Petition Date, and the priority amount of such claims are capped at $13,650.00. To the extent an Allowed wage claim exceeds $13,650.00, the balance of the claim is an unsecured claim which will be treated with the treatment of Class 3 Creditors.

_Treatment_: Priority wage claims will be paid in full on the later of the Effective Date, or within thirty (30) days of the Claim being Allowed.

_Voting_: Class 1 is an Unimpaired Class and shall not have the right to vote to accept or reject the Plan, but will be deemed to have accepted the Plan.

### ii.    Class 2 - Noteholder Claims

_Classification_: Class 2 consists of the Claims of Noteholders against the Debtors totaling $4,955,651.00.

_Treatment_: On the Effective Date of the Plan, the sum of $2,416,408.00, shall be converted to Common Stock in SITO Mobile Ltd., on a pro rata basis, at a valuation of $.018 a share. Following repayment of the Plan Funding, the Initial and Second Class 3 Distribution, Class 2

Noteholders shall receive their pro rata share of the Net Litigation Proceeds until Class 2 Noteholders have received in full the balance of their claims, after the conversion of $2,416,408.00 in stock, in the total amount of $2,539,243.00.

The Common Stock issued to Noteholders in partial satisfaction of Class 2 Claims pursuant to the Plan will be authorized under Section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, except as otherwise may be required by SITO Mobile, Ltd.'s charter or by-laws, or applicable law, regulation, order or rule.

*Voting*: Class 2 is Impaired and Holders of Class 2 Claims shall have a right to vote to accept or reject the Plan.

### iii.  Class 3 - General Unsecured Claims

*Classification*:  Class 3 consists of the Claims of Holders of General Unsecured Claims.

*Treatment*:  Each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata share of the following distributions:

a.  Twenty percent (20%) of the Allowed Amount of Class 3 Claims shall be paid as soon as practicable after the Effective Date of the Plan, in cash;

b.  Holders of Allowed Class 3 Claims shall receive a second distribution (the "Second Class 3 Distribution") following repayment of the Plan Funding from the first net proceeds of the IP Litigation at such intervals as is determined by the Plan Administrator, until the Allowed Claims of Class 3 Creditors have received sixty percent (60%) of their Allowed Claims;

c.  Following repayment of the Plan Funding, payment of the Second Class 3 Tranche and the cash payment to Class 2 creditors, the Allowed Claims of Holder of Class 3 Claims shall receive a pro rata distribution from fifty percent (50%) of additional recoveries on the IP Claims, until Holders of Allowed Class 3 Claims have received one hundred percent (100%) of the principal of their Allowed Claims.  The other 50% of net recoveries on the IP Litigation, following repayment of the Plan Funding, the Second Class 3 Tranche, and the cash payment to Class 2 Creditors shall be retained by the reorganized Debtors.

*Voting*:  Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

### iv.  Class 4 – Equity Interests

*Classification*: Class 4 consists of all owners of stock, membership or equity interests in the Debtors.

*Treatment*: The Holders of stock, membership interests, and other equity interests in the Debtors, as of the Petition Date, shall retain their ownership interests following the Effective Date of the Plan.

*Voting*: Holders of Class 4 Claims are Unimpaired and are deemed to accept the Plan.

### 6. Distributions under the Plan

Article IV of the Plan establishes the procedures and guidelines for Distributions to be made to the Holders of Allowed Claims, including the timing, procedures and notice provisions related to same. On or before the Effective Date of the Plan, the Plan Funders shall advance to the Debtors the sum of $5 million. These proceeds will be utilized to pay the initial distribution to Class 3 Unsecured Creditors, to pay any and all priority claims, and to pay the administrative expenses of the within Chapter 11 proceedings. Any remaining funds will be used for the Debtors' ongoing operations.

### a. Plan Distributions

Except as otherwise provided in the Plan, the Plan Administrator shall make quarterly distributions, when sufficient funds are on hand to fund distributions.  Notwithstanding the foregoing, the Plan Administrator may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Estate during liquidation, (ii) to pay reasonable administrative expenses (including Post-Effective Date Expenses and any taxes imposed in respect of the Assets), (iii) to satisfy other liabilities to which the Assets are otherwise subject, in accordance with the Plan, and (iv) to establish the Reserve Accounts. All distributions to the Holders of Allowed Claims shall be made in accordance with the Plan. The Plan Administrator may withhold from amounts distributable to any Person any and all amounts determined in the Plan Administrator's reasonable sole discretion to be required by any law, regulation, rule, ruling, directive or other governmental requirement. Holders of Allowed Claims shall, as a condition to receiving distributions, provide such information and take such steps as the Plan Administrator may reasonably require to ensure compliance with withholding and reporting requirements and to enable the Plan Administrator to obtain certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

### b. Manner of Payments Under the Plan

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on a domestic bank selected by the Plan Administrator in accordance with the Plan or by wire transfer from a domestic bank, at the option of the Plan Administrator. The Plan Administrator may use the services of a third party to aid in the Distributions required to be made under this Plan. All Distributions under the Plan on account of any Allowed Claims shall be made by regular, first-class mail, postage pre-paid in an envelope at: (i) the address of the Holder of such Allowed Claim as set forth in a filed proof of Claim and Claims Register or (ii) such other address as such Holder shall have specified for payment purposes in a written notice to the Plan Administrator at least fifteen (15) days prior to such Distribution Date. Subject to the Plan, the Plan Administrator shall make a good faith effort to ascertain an alternative address and will re-mail any undelivered

DocuSign Envelope ID: 50318471-2955-46BA-A244-B55464B7DC9E

Distributions or notices that were returned marked "undeliverable" or "moved - no forwarding address" or for a similar reason.

### c. <u>No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars</u>

Any contrary provision of the Plan notwithstanding, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with halfpennies or less being rounded down and fractions in excess of half of a penny being rounded up.

Any contrary provision of the Plan notwithstanding, for purposes of administrative convenience, no Distribution of less than one hundred ($100.00) shall be made pursuant to the Plan. Whenever any Distribution of less than twenty-five dollars ($100.00) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator for the account of the recipient until such time that successive Distributions aggregate to twenty-five dollars ($25.00), at which time such payment shall be made, and if successive Distributions do not ever reach twenty-five dollars ($25.00) in the aggregate, then such Distributions shall revert to the Estate, be treated as Remaining Cash of the Estate and be distributed in accordance with the Plan.

### d. <u>Indefeasibility of Distributions</u>

All Distributions provided for under the Plan shall be indefeasible.

### e. <u>Full and Final Satisfaction</u>

All payments and all Distributions under the Plan shall be in full and final satisfaction of the Debtors' obligations with respect to Claims against that Debtors, except as otherwise provided in the Plan.

### f. <u>Distributions Only on Business Days</u>

If any Distribution under the Plan is due on a day other than a Business Day, such Distribution shall instead be made the next Business Day.

### 7. <u>Payment of Taxes on Distributions Received Pursuant to the Plan</u>

Any contrary provision of the Plan notwithstanding, as a condition to payment of any Distribution to a Creditor under the Plan, each Creditor shall provide a valid tax identification or social security number (collectively the "<u>Tax Information</u>") for purposes of tax reporting by the Plan Administrator. All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions. At such time as the Plan Administrator believes that Distributions to a particular Class of Claims is likely, the Plan Administrator shall request Tax Information in writing from the Creditors (the "<u>Tax Information</u>

Request"). Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request, <u>shall forfeit all Distributions</u> such Creditor may otherwise be entitled to under this Plan and such forfeited funds will revert to the applicable Debtor's Estate, be treated as Remaining Cash of the applicable Estate and be disbursed in accordance with the Plan.

### 8.  <u>Unclaimed Distributions</u>

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within six (6) months after the Distribution Date or which Distributions are returned to the Plan Administrator as undeliverable to the addresses specified in the Claims Register, as it shall exist on the date such Distributions are made), shall be canceled (by a stop payment order or otherwise).  The Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court and the Holder of such Claim(s) shall be removed from the Distribution schedules, expunged from the Claims Register and shall receive no further Distributions under the Plan.  Any such Unclaimed Distributions shall revert to the Debtors, and shall be deemed property of the Reorganized Debtors.

### 9.  <u>Disallowance of Claims Without Further Order of the Court</u>

As of the Confirmation Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a proof of Claim has not been filed by the Creditor, shall be deemed disallowed and expunged.  All Scheduled Claims that correspond to a Proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later filed Proof of Claim and the Scheduled Claims, regardless of priority, shall be expunged from the Claims Register; provided however, that such Proofs of Claim shall be subject to objection in accordance with the Plan.

### 10.  <u>Appointment of Plan Administrator</u>

The Plan provides for the appointment of the Plan Administrator, Daniel M. Stolz, Esq. The Plan will be implemented by the Plan Administrator in a manner consistent with the terms and conditions set forth in the Plan and the Confirmation Order.

The Plan Administrator shall be the "representative of the estate," as that phrase is used in the Bankruptcy Code, and shall have all powers, authority and responsibilities specified in the Plan, including, without limitation, the powers of a trustee under Sections 704 and 1106 of the Bankruptcy Code.  The Plan Administrator shall exclusively enforce and liquidate any and all such Claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the Debtor and the Holders of Allowed Claims, including any and all Causes of Action that were or could have been commenced by the Debtor or the Estate prior to the Effective Date and shall be deemed substituted for the same as the party in such action.  After the Effective Date, the Plan Administrator shall have the sole authority to review, object to and settle Claims, subject to consultation with the Plan Funders.

In summary, the Plan Administrator will be empowered with broad reaching general powers, rights and responsibilities to seek recoveries for the Liquidating Estate, make any distributions to creditors, and perform administrative functions under the Plan. Such powers include the ability for the Plan Administrator to pursue all Causes of Action belonging to the Estate on behalf of the Estate. Such Causes of Action include the "Avoidance Actions."

The Plan Administrator shall be governed by the Plan Administrator Agreement, a copy of which is annexed as **Exhibit "B"** to this Disclosure Statement, the Plan and the Confirmation Order. The Plan Administrator shall be entitled to retain professionals such as attorneys, financial advisors, and accountants (including professionals employed by the Committee or the Debtors), to assist him in the administration of the post-confirmation Liquidating Estate. The Bankruptcy Court shall retain jurisdiction to resolve all issues concerning the actions of the Plan Administrator and any issues which arise subsequent to the Effective Date of the Plan.

The fees and expenses of the Plan Administrator and professionals which he retains are Post-Confirmation Expenses (as defined in the Plan), shall share equal priority with Allowed Administrative Claims with regard to the distribution of Net Estate Assets, and shall be paid on a pro rata basis with the other Allowed Administrative Claims from the Net Estate Assets, prior to any distribution to creditors.

## 11. <u>Retention of Rights and Causes of Action</u>

Except as otherwise provided in the Plan or this Disclosure Statement, all present and future rights, claims, or Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors hold on behalf of the Estate or of the Debtors in accordance with any provision of, among other things, the Bankruptcy Code, including Sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code, or any applicable nonbankruptcy law against any Person that have not been released or sold on or prior to the Effective Date are preserved for the Plan Administrator, including but not limited to directors and officers Claims. On the Effective Date, pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Administrator shall have possession and control of, and shall retain and have the right to enforce, pursue, litigate and compromise any and all present or future rights, claims, or Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses against any Person and with respect to any rights of the Debtors. The Plan Administrator has, retains, reserves and shall be entitled to assert and pursue such claims, Causes of Action, rights of setoff, or other legal or equitable defenses, and all legal and equitable rights of the Debtors not expressly released under the Plan after the Effective Date. Any Distribution provided for in the Plan and the allowance of any Claim for the purpose of voting on the Plan is and shall be without prejudice to the rights of the Plan Administrator to pursue and prosecute any such actions. Except as otherwise set forth in the Plan, all Causes of Action of the Debtors shall survive Confirmation of the Plan and shall be transferred to the Plan Administrator, and the commencement and prosecution of Causes of Action of the Debtors shall not be barred or limited by res judicata or any estoppel, whether judicial, equitable or otherwise.

DocuSign Envelope ID: 50318471-2955-4A6A-A344-B55464B7DC9E

### 12. **Plan Funding**

The initial funding for the Plan will be provided by the Plan Funders, pursuant to the Plan Funding Agreement annexed hereto and marked **Exhibit "C"**. Payments to be made subsequent to the Effective Date of the Plan shall be made from the Net Recoveries on IP Litigation and Avoidance Claims, as set forth in more detail in the Plan.

### 13. **Financial Data Disclaimer**

The financial data relied upon in formulating the Plan is based upon, among other things, the Schedules, the Proofs of Claim and the Debtors' books and records, which are not audited. The information contained in this Disclosure Statement is provided by the Debtors. The Debtors represent that everything stated in the Disclosure Statement is true to the best of its knowledge as of the date hereof.

### 14. **Vesting of Assets Under the Plan**

On the Effective Date of the Plan, the assets of the Estates will vest in the Reorganized Debtors, subject to the provisions of the within Plan and the obligations to make payments with regard thereto. The Avoidance Claims shall not revest in the Debtors and shall be the exclusive property of the within bankruptcy Estates, to be administered by the Plan Administrator.

### 15. **Preservation of Records**

Under the Plan, all Causes of Action, claims, rights or interests of the Estate are preserved and retained and may be enforced by the Plan Administrator. The Debtors will take all steps necessary to assure that all records of the Debtors are preserved. The vast majority of the Debtors' records are maintained in electronic form. The Debtors will work cooperatively with the Committee and the Plan Administrator to assure that all records are preserved and available to the Plan Administrator.

### 16. **Objections to Claims**

Under the Plan, the Plan Administrator is authorized to object to Claims and to compromise or settle, pursuant to the Notice provisions of the Plan, Disputed Claims, against the Debtors' Estates.

### 17. **Executory Contracts and Unexpired Leases.**

The Plan provides that all Executory Contracts and Unexpired Leases not previously assumed or rejected by the Debtors prior to the Effective Date shall be deemed rejected under this Plan. The Confirmation Order shall approve, as of the Effective Date, the rejection of each lease and contract that has not been previously assumed. If you are a party to a lease or contract to be rejected, and you object to the rejection of your lease or contract, you must file

DocuSign Envelope ID: 59318471-2955-486A-A344-B55464B7DC0F

and serve your objection to the proposed rejection within the Objection Deadline fixed by the Court for objections to confirmation of the Plan.

All Proofs of Claim with respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease must be filed within the Bankruptcy Court within thirty (30) days after the earlier of (i) the Effective Date or (ii) an order of the Bankruptcy Court approving such rejection. Any such Claims, proofs of which are not filed timely, will be forever barred from participating in any distribution under this Plan.

### 18. <u>Tax Consequences of the Plan.</u>

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY EFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.

The Debtors and Committee have not requested any ruling from the Internal Revenue Service or any other taxing authority with respect to the federal or state income tax consequences of the Plan or obtained any opinion of counsel. The Proponents offer no statements or opinions that are to be relied upon by creditors as to the treatment of Creditors' claims under the Plan. Matters not discussed in this Disclosure Statement may affect the tax consequences of the Plan on any holder of a claim or equity interest. The tax consequences to creditors and interest holders will differ and will depend on factors specific to each creditor or interest holder.

### 19. <u>Information of Reporting and Backup Withholding.</u>

Distributions on account of Claims under the Plan may be subject to applicable information reporting and backup withholding. Backup withholding of taxes will generally apply to payments in respect to a claim under the Plan if the holder of such claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the Holder's U.S. Federal income tax liability and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the IRS.

### M. <u>Risk Factors</u>

This Disclosure Statement contains assumptions with respect to Plan Funding and recoveries on the Avoidance Claims and IP Litigation. There can be no assurance that any assumptions contained in this Disclosure Statement are accurate or will be successfully concluded. Projections, by nature, are based upon future events which could not be predicted with accuracy and there is no assurance that the necessary funds can or will be obtained. Each Creditor and each of their respective advisors must carefully read and consider the

DocuSign Envelope ID: 5031847112955149BA-A344-B55464B7DC0F

assumptions which are part of the projections in determining whether to vote for or against the Plan.

**N. <u>Post-Confirmation Quarterly Fees</u>**

Quarterly fees pursuant to 28 U.S.C. §1930(a)(6) continue to be payable to the Office of the U.S. Trustee post-confirmation until such time as the case is converted, dismissed or closed pursuant to a final decree.

**O. <u>Setoff</u>**

The Reorganizing Estates, pursuant to and to the extent permitted by applicable law, may, but shall not be required to, set off against or recoup from the payments to be made pursuant to the Plan in respect of a Claim, any Claim of any nature whatsoever that the Debtors or the Reorganizing Estates, as applicable, may have against the Holder of such Claim, but neither the failure to do so or the allowance of any Claim hereunder shall constitute a waiver or release of any such claim by the Debtors, the Reorganizing Estates, against such Holder.

**P. <u>Other Provisions of the Plan</u>**

**1. <u>Retention of Jurisdiction</u>**

The Bankruptcy Court will retain jurisdiction and implement the Plan as provided in Article XI of the Plan.

**2. <u>Claims Objection Bar Date</u>**

The Plan Administrator shall have until the Effective Date of the Plan (the "<u>Claims Objection Bar Date</u>") to object to the allowance of claims, which deadline may be extended by the Court.

**3. <u>Effective Date</u>**

The Effective Date of the Plan shall be the fifteenth (15th) day following the entry of a final Order confirming the Plan.

**4. <u>Modification</u>**

The Proponents reserve the right to revoke and withdraw the Plan at any time on or before the Confirmation Date. If the Proponents revoke or withdraw the Plan pursuant to this section, or if Confirmation or the Effective Date does not occur, then the Plan shall be deemed null and void and, in such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtor or any entity in any further proceedings involving the Debtors.

DocuSign Envelope ID: 50318471-2955-4A6A-A344-B55464B7DC0E

**5.    Conditions to Confirmation of the Plan**

Confirmation of the Plan is conditioned upon the satisfaction of each of the following conditions precedent, any one or more of which may be waived by agreement of both the Debtors and the Committee in writing: (i) the Bankruptcy Court shall have approved a disclosure statement to the Plan in form and substance acceptable to Proponents; (ii) the Disclosure Statement Approval Order shall have been entered and shall have become a Final Order; and (iii) the Court shall have signed the Confirmation Order and entered it on the docket of the Bankruptcy Case, which Confirmation Order shall be in form and substance acceptable to Proponents and may not be amended, modified, supplemented, or clarified without the prior consent of Proponents prior to the Effective Date and the Plan Administrator after the Effective Date; and (iv) the Confirmation Order shall not be subject to any stay of effectiveness.

**6.    Conditions to the Effective Date**

The occurrence of the Effective Date is conditioned upon the satisfaction of each of the following conditions precedent, any one or more may be waived by the Debtors and the Committee in writing: (i) the Confirmation Order shall have become a Final Order; (ii) the Confirmation Date shall have occurred; (iii) no request for revocation of the Confirmation Order under Section 1144 of the Bankruptcy Code shall have been made, or if made, shall remain pending; (iv) the appointment of the Plan Administrator shall have been confirmed by order of the Bankruptcy Court, which may be the Confirmation Order; (v) the Debtors shall have sufficient Cash on hand to pay all Administrative Claims, Professional Fee Claims,  U.S. Trustee Fees and the Initial Class 3 Distribution, and (vi) the Plan Funding has been provided by the Plan Funders.

## Q.  Securities Law Matters

**1.    Issuance of Securities**

Holders of Class 2 Claims will receive shares of Common Stock of SITO Mobile, Ltd., pursuant to the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (1) the securities must be issued "under a plan" of reorganization by the debtor (or its successor under a plan or by an affiliate participating in a joint plan of reorganization); (2) the recipients of the securities must hold a pre-petition or administrative expense claim against the debtor or an interest in the debtor; and (3) the securities must be issued entirely or "principally" in exchange for the recipient's claim against or interest in the debtor. In reliance upon this exemption, the Debtors believe that the issuance of the Common Stock to the Holders of Class 2 Claims under the Plan will be exempt from registration under the Securities Act and state securities laws.  Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, and under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any

DocuSign Envelope ID: 50318471-2955-4B6A-A314-B55464B7DC0F

such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

## 2. __Subsequent Transfers of Securities__

In general, Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered or sold under a plan for the holders of such securities; (iii) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

To the extent that persons deemed to be "underwriters" (which definition includes "Controlling Persons") receive Common Stock of SITO Mobile, Ltd., pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such Common Stock unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Notwithstanding the foregoing, persons deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the Common Stock of SITO Mobile, Ltd., to be issued pursuant to the Plan (including whether the Person is a "Controlling Person") would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any such person would be such an "underwriter."  PERSONS WHO RECEIVE COMMON STOCK OF SITO MOBILE, LTD., UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL

DocuSign Envelope ID: 5031847129551496A-A244-B55464B7D69F

ADVISOR WITH RESPECT TO THE AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144 OR OTHER APPLICABLE EXEMPTIONS.

### R. Confirmation Requirements and Procedures

Persons or entities concerned with confirmation of this Plan should consult with their own attorneys because the law on confirming a Plan of Liquidation is complex.

Many requirements must be met before the Bankruptcy Court can confirm the Plan. Some of the requirements include that the Plan must be proposed in good faith, that impaired creditors or interest holders shall have accepted the Plan, that the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and that the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation.

### 1. Who May Vote or Object?

Any party in interest may object to confirmation of the Plan, but as set forth herein and in the Plan, not every creditor is entitled to vote to accept or reject the Plan. For example, only impaired creditors or equity holders may vote to accept or reject this Plan. Under the Plan, Classes 1 and 2 are not impaired and are therefore deemed to have voted to accept the Plan. Class 3 is impaired and may vote to accept or reject the Plan. Classes 4 and 5 are also impaired but are deemed to reject the Plan.

### 2. What is an Allowed Claim/Interest?

A Creditor or an Interest Holder must first have an allowed Claim or Interest in order to have a right to vote. Generally, any Proof of Claim or Interest will be allowed, unless a party in interest brings a motion to object to the claim. When an objection to the Claim or Interest is filed, the Creditor or Interest Holder cannot vote unless the Bankruptcy Court, after a notice and a hearing, either overrules the objection or allows the Claim or Interest for voting purposes.

A Creditor or interest Holder may have an allowed Claim or Interest, even if a Proof of Claim or Interest was not timely filed. A Claim is deemed allowed if (i) it is scheduled on the Schedules and such Claim is not scheduled as disputed, contingent or unliquidated, and (ii) no party in interest has objected to the Claim as it is scheduled.

An Allowed Claim or Interest only has a right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the member of that class in full on the Effective Date of the Plan.

### 3. Votes Necessary to Confirm the Plan

If impaired classes exist, the Bankruptcy Court cannot confirm the Plan unless (i) unless one impaired class has accepted the Plan without counting the votes of any insiders

within that class, and (ii) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed subsequently herein.

A class of claims is considered to have accepted the Plan when more than one-half in number and at least two-thirds in dollar amount of the allowed claims in that class voted in favor of the Plan. A class of interest is considered to have accepted the Plan when at least two-thirds in amount of the allowed interest holders of such class voted to accept the Plan. Any ballot that is executed by the Holder of an Allowed Claim or Interest, but does not indicate an acceptance or rejection of the Plan, shall be deemed to be an acceptance of the Plan.

### 4.   <u>Treatment of Non-Accepting Classes</u>

As noted above, even if all impaired classes do not accept the proposed Plan, the Bankruptcy Court may nonetheless confirm the Plan, if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to bound by the terms of the Plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of Claims or Interests if it meets all consensual requirements except the voting requirement of §1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has voted to accept the Plan.

### 5.   <u>Liquidation Analysis</u>

The Plan Funding is contingent upon the Debtors remaining in business and pursuing recoveries on the IP Litigation.

The Debtors have been advised by IP Counsel, that the continued operation of the Debtors' business and the emergence of the Debtors from Chapter 11 are necessary and valuable to the successful pursuit of the IP Litigation. The Debtors' current officers are essential to the prosecution of the IP Litigation and such employees likely would not remain associated with the Debtors, should the within Chapter 11 cases be converted to Chapter 7 liquidations. Indeed, the Debtors believe that recoveries on account of the IP litigation would be lower if pursued by a chapter 7 trustee because of lack of institutional knowledge and also lack of any connection to IP Counsel, resulting in reduced recovery of assets and thus lower distributions to creditors.

In a Chapter 7 liquidation, the only assets which would be available to creditors would be a very small amount of accounts receivable and the Debtors' IP Assets. Because of the age of the IP Assets themselves, the value of such IP Assets in a liquidation would be much less than creditors would receive under the within Plan.

DocuSign Envelope ID: 50318471-2955-406A-A314-B55464B7DC0F

Based upon the foregoing, the Debtors strongly believe that creditors will receive far more under the within Plan than they will receive if these cases were converted to Chapter 7 and a trustee was appointed.

### 6.   Feasibility

Since the Debtors will have received the Plan Funding prior to the Effective Date, and since any subsequent distributions are contingent upon recoveries from the IP Litigation and Avoidance Claims, there is no question that the within Plan is feasible.

### 7.   Post Effective Date Management

Following the Effective Date of the Plan, the Debtors day to day affairs will continue to be supervised by Thomas Candelaria, the Debtors' CEO and Lisa Patrick, the Debtors' Chief Operating Officer.  Mr. Candelaria and Ms. Patrick shall report to the Debtors' existing Board of Directors, which shall remain in place. The Employment Agreement between the reorganized Debtors and Mr. Candelaria is annexed hereto and marked Exhibit "A".

Distributions to creditors, communication with the post-confirmation committee, pursuit of avoidance claims and other administrative matters with regard to the bankruptcy proceedings will be the responsibility of the Plan Administrator, pursuant to the Plan Administrator Agreement.

### S.   Effect of Confirmation of the Plan

#### 1.   Discharges and Releases

Pursuant to 11 U.S.C. §1141(a), upon the Effective Date of the Plan, the Plan shall bind the Debtors, any entity issuing securities under the Plan, any entity acquiring property under the Plan, and any creditor, equity security holder, or general partner in the Debtors, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the Plan, and whether or not such creditor, equity security holder, or general partner has accepted the Plan.

In addition to the foregoing, except in the case of gross negligence, willful misconduct, intentional fraud, or criminal conduct, the Plan provides for exculpation of the Debtors, creditors' committee, and all professionals with regard to conduct that occurred during these Chapter 11 cases.

Finally, the Plan contains a release in favor of the Plan Funders, which releases the Plan Funders from any potential claims (other than for gross negligence, willful misconduct, intentional fraud, or criminal conduct), which could have been asserted by the Debtors, equity holders, or creditors of the within bankruptcy estates.  This release to the Plan Funders is being provided in exchange for the Plan Funding which is allowing the Debtors to emerge from Chapter 11 and to make distributions to other classes of creditors.

DocuSign Envelope ID: 59318471-2955-4B6A-A244-B55464B7D60F

### 2.  Terms of Injunctions and Stays of Injunctions

Unless otherwise provided by a Final Order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Case pursuant to Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall be converted into injunctions under the Plan and shall remain in full force and effect pursuant to 11 U.S.C. §§ 362(c)(2)(A) and (B) until the Bankruptcy Case is closed or dismissed.

Except as otherwise expressly provided for in this Plan, all persons who have held, hold or may hold claims, debts, or interests shall be enjoined on or after the Effective Date pursuant to 11 U.S.C. §§ 362(c)(2)(A) and (B): (a) from commencing or continuing in any manner or any action or proceeding of any kind or respect to any such claim, debt, or interests against the Debtors, the Plan Administrator, or the Estates; (b) from the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor or property of the Debtors or the Estates; (c) from creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or the Estates; and (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due from the Debtors, the Estates, or any property of the Debtors or the Estates.

Except as otherwise specifically provided for by the Plan, Holders of Claims or Equity Interests against the Debtors are not barred or otherwise enjoined by the Plan from pursuing any recovery against Persons that are not the Debtors.

### T.  Alternatives to the Plan and Consequences of Rejection

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (i) an alternative plan could be proposed or confirmed; or (ii) the Bankruptcy Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

### 1.  Alternative Plan

With respect to an alternative plan, the Debtor and the Committee and their professional advisors have considered alternative scenarios and believe that the Plan enables the Holders of Claims to realize the maximum recovery under the circumstances.  The Debtor and the Committee believe the Plan is the best plan that can be proposed and serves the best interests of the Debtor and other parties-in-interest.

### 2.  Chapter 7 Liquidation

As discussed above, with respect to each Class of Impaired Claims, either each Holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code. The Debtor and the Committee believe that significant costs would be incurred by the Estate as a result of the delay that would be caused by

conversion of the Bankruptcy Case to a case under chapter 7, resulting in a reduced distribution to Creditors.

## CONCLUSION

The Proponents encourage all parties in interest to carefully read the Plan as its terms control over the Disclosure Statement. For the reasons contained herein, the Proponents submit that confirmation of the Plan is in the best interest of Creditors and the Estate.

**SITO MOBILE SOLUTIONS, INC.**
**SITO MOBILE, LTD.**
**SITO MOBILE R&D IP, LLC**

By: __ *Thomas Candelaria* _____
   THOMAS CANDELARIA
   CEO

Dated: July 15__, 2021